IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| APPLIED PREDICTIVE TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| MARKETDIAL, INC. and JOHN M. STODDARD, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiff Applied Predictive Technologies, Inc. ("Plaintiff" or "APT") brings this complaint against defendants MarketDial, Inc. ("MarketDial") and John M. Stoddard a/k/a Johnny Stoddard ("Stoddard"), or collectively ("Defendants") for patent infringement and misappropriation of trade secrets.

## NATURE OF THE ACTION

1.      This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.; misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.; and misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA"), 6 Del. C. §§ 2001, *et seq*.

2.      Defendants MarketDial and Stoddard have engaged in a systematic effort to acquire valuable confidential and trade secret information from APT and improperly use it for their own advantage.  Both of MarketDial's founders, Stoddard  and Morgan Davis ("Davis"), previously worked for companies that had contractual working relationships with APT which were governed by confidentiality agreements that bound all employees, including Stoddard and

Davis, who had access to APT's confidential and trade secret information, to maintain the confidentiality of that information and not to use it for any other purpose.

3.       Specifically, Stoddard worked at McKinsey & Company, Inc. ("McKinsey") from August 2013 to April 2016.  McKinsey entered into a Cooperation and Confidentiality Agreement dated November 7, 2013 ("Confidentiality Agreement") with APT by which APT agreed to provide access to APT confidential information in connection with McKinsey's client development and/or client services as well as each party's internal consideration of a potential transaction with other parties.  McKinsey agreed that it and its employees would use APT confidential information only for the purposes of the Confidentiality Agreement, and to keep confidential and not disclose such information to anyone other than McKinsey employees with a need to know who were bound by the Confidentiality Agreement.  Stoddard was aware of and agreed to be bound by the terms of the APT Confidentiality Agreement. Stoddard used his status as an employee of McKinsey, subject to the same confidentiality obligations to APT as McKinsey, to gain access to APT's confidential and trade secrets information.

4.       While Stoddard was receiving APT's confidential and trade secrets information on behalf of McKinsey to benefit APT, Stoddard surreptitiously co-founded MarketDial, a Delaware corporation, to compete with APT. Through his employment with McKinsey and after the founding of MarketDial, Stoddard continued to request and receive APT's trade secret information, including relating to its software, business strategies, and customers.  During this time, Stoddard was working and residing in Ohio and, for a time, in California, and purported to need access to APT's confidential and trade secret information in connection with marketing efforts directed to Delaware corporations, purportedly for the benefit of APT, but in reality for his own personal benefit and that of MarketDial, the Delaware company he admittedly co-

founded.  Without disclosing his interest in MarketDial, Stoddard learned key aspects of how APT's proprietary software operates and repeatedly requested and received confidential and trade secret information from APT, all under the guise of benefitting the APT and McKinsey relationship.

5.      Stoddard duped APT into providing its confidential information and trade secrets to benefit himself personally and his newly-formed company, MarketDial, and used MarketDial, a Delaware corporation, to carry out his scheme to misappropriate APT's trade secrets.  Upon information and belief, Stoddard intentionally misappropriated APT confidential information and trade secrets in violation of McKinsey's Confidentiality Agreement  with APT and federal and state law.

6.      In addition, MarketDial has infringed and continues to infringe one or more claims of APT's U.S. Patent No. 8,571,916 ("the '916 Patent") at least by making, using, selling, and/or offering to sell its MarketDial System (the "Accused System") in the United States, including in this District.

7.      Upon information and belief, Stoddard and MarketDial have incorporated key features of the functionality of APT's products and services into MarketDial's products and services.  Stoddard and Davis founded MarketDial specifically to compete against APT and have approached APT clients in an effort to siphon them off.  In at least two instances, MarketDial has stolen business from APT, causing APT to suffer substantial damages.

8.      By letter dated December 18, 2017, APT contacted MarketDial and Stoddard in an attempt to explore with MarketDial and Stoddard the concerns APT had about their use of APT trade secrets and infringement of APT's patents, seeking more information about the methodology of MarketDial's software, and requesting a meaningful discussion of these issues,

all in an effort to avoid a legal dispute.  In response, MarketDial admitted by letter that it

competes in the same space as APT and for some of the same customers, but MarketDial

nevertheless refused to meet with APT, pursue any discussions, or provide APT with any

information about the methodology of its software.  MarketDial also denied that Stoddard was

ever privy to APT's confidential and trade secret information, despite clear evidence to the

contrary.  MarketDial further denied that it uses APT's patented technology.  Based upon APT's

investigation, and despite the refusal of MarketDial and Stoddard to cooperate in the requested

discussions, APT determined that MarketDial and Stoddard were using APT's trade secret

information disclosed to Stoddard subject to strict confidentiality obligations and that the

Accused Systems infringe one or more claims of the '916 Patent. As a result, APT now seeks

relief from this Court to enjoin Defendants from using APT's confidential and trade secret

information and from infringing the '916 Patent.  APT further seeks an award of damages for the

injury it has incurred as a result of Defendants' trade secret misappropriation and willful

infringement of APT's patent.

## THE PARTIES

9.      Plaintiff APT is a corporation, organized and existing under the laws of the State

of Delaware, with its principal place of business at 4250 N. Fairfax Drive, 11th Floor, Arlington,

Virginia 22203.

10.     Defendant MarketDial is a corporation, organized and existing under the laws of

the State of Delaware, with its principal place of business at 12 W. Market Street, Suite 220, Salt

Lake City, Utah 84102.

11.     Defendant Stoddard is a founder of MarketDial, serves as an officer and director

of MarketDial, and during his misappropriation of APT's trade secrets while working at

McKinsey, resided in Ohio and/or California.  After misappropriating APT's trade secrets and

leaving McKinsey, Stoddard moved to Utah and upon information and belief now resides at 110 South 100 West, Lehi, Utah 84043-2665.

12.     Upon information and belief, MarketDial directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell and/or sells the Accused System in the United States, including in the District of Delaware, and otherwise purposefully directs infringing activities to this District in connection with the Accused System.

## JURISDICTION AND VENUE

13.     This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*; misappropriation of trade secrets under the DTSA, 18 U.S.C. § 1836, *et seq.*; and misappropriation of trade secrets under the DUTSA, 6 Del. C. §§ 2001, *et seq.*

14.     This Court has original subject matter jurisdiction over APT's claims for patent infringement pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §§ 271 *et seq.*  This Court has subject matter jurisdiction over APT's federal trade secret claim pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331 because Plaintiff has asserted a claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016.  This Court has supplemental jurisdiction over APT's claim under the Delaware Uniform Trade Secrets Act pursuant to 28 U.S.C. § 1367 because this claim is so related to Plaintiff's patent infringement claim and federal misappropriation of trade secrets claim that it forms part of the same case or controversy under Article III of the United States Constitution.

15.     This Court has personal jurisdiction over MarketDial because it is incorporated in the State of Delaware and therefore resides in this District.

16.     This Court has personal jurisdiction over Stoddard pursuant to Delaware Statute Del. Code. Ann. Tit. 10, §§ 3104 and 3114 because Stoddard is a nonresident officer and director of MarketDial and is a necessary or proper party to this litigation, and because Stoddard has

transacted business and performed work in this State, caused tortious injury in this State by an act in this State, and/or caused tortious injury in this State by an act outside this State and/or regularly done or solicited business in this State or engaged in a persistent course of conduct in this State.

17.     Venue is proper in this judicial district for APT's claims for patent infringement pursuant to 28 U.S.C. §§ 1391(c) and 1400(b).  MarketDial is incorporated in the State of Delaware and therefore resides in this judicial district pursuant to 28 U.S.C. § 1400(b).

18.     Venue is proper in this judicial district for APT's federal trade secret misappropriation claim under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the State of Delaware and in this judicial district. In addition to the allegations above and below, Stoddard's acts as a founder of MarketDial and incorporation of MarketDial in Delaware were in furtherance of his scheme to misappropriate trade secrets from APT, a Delaware corporation.

## FACTS

## APT's Innovation and Industry Recognition

19.     APT, founded in 1999, is a global leader in the business analytics software industry, and helps businesses make decisions based on analysis of their customers' actions using innovative tools developed by APT at great expense over many years.  APT services customers in a variety of industries, including retail, restaurants, financial services, consumer packaged goods, airlines, automotive, hotels, insurance, life sciences, healthcare, and telecommunications and media.  APT's software includes Test & Learn, Market Basket Analyzer, and Space Planning Optimizer.  APT's customers include Walmart, Coca-Cola, McDonald's, TD Bank, Starbucks, SunTrust, Big Lots, Victoria's Secret, T-Mobile, and Kellogg's.

20.     Through its substantial investment in research and development over the past 19 years, APT has developed innovative, cutting-edge technologies that changed the face of data-driven analytics and resulted in APT's customers making data-driven decisions using APT's proprietary software.  As such, sensitive, confidential, and proprietary information and trade secrets form the backbone of APT's success in its business.

21.     APT has devoted much time and expense over the years to developing trade secrets, including its proprietary and confidential technical information, knowledge, and business strategy.  As indicated by its success, APT has developed and acquired proprietary information and knowledge in relation to its software systems, including not only in its technical and performance specifications, but also in the business plans and business strategies surrounding its systems and APT's customers.

22.     APT's products and services enable customers to test the efficacy of a business initiative, e.g., a sales promotion, a retention program, or a customer loyalty offer.  Through technologically refined setup of business initiative tests and detailed statistical analysis of the actual and predicted results of the business initiative test, APT is able to determine for the customer the business initiative's true impact and recommending the most profitable action for the customer to take.

23.     On March 1, 2006, APT filed U.S. Patent Application No. 11/364,197 ("the '197 Application"), which was a continuation-in-part application of U.S. Patent Application No. 10/767,191, filed on January 30, 2004.  The '197 Application issued as the '916 Patent on October 29, 2013.  The '916 Patent discusses the benefits of business initiative testing and the criticality of properly setting up a business initiative test, necessitating a technological solution to

the issue of determining the optimal system parameters for each business initiative test.  The

'916 Patent provides a technological solution that addresses these needs.

24.    APT has won numerous awards for its technological achievements, including:

- 2014 International Business Awards ("IBA") Gold Stevie Winner for Best New Product or Service of the Year - Software - Big Data Solutions for the APT Index;

- 2014 IBA Bronze Stevie Winner for Most Innovative Company of the Year in Canada and the U.S.A. - All Technology Industries;

- 2014 Business Intelligence ("BIG") Award for New Product of the Year for the APT Index;

- 2015 BIG Award for New Product of the Year in the IT/Telecom Category for its Space Planning Optimizer Software;

- 2015 IBA Silver Stevie Winner for Best New Product of Service of the Year - Software - Big Data Solutions  for its Space Planning Optimizer Software;

- 2016 Bronze American Business Award for Network Planner with MasterCard Insights software; and

- 2016 BIG Award for New Product of the Year.

**Background on and Founding of MarketDial**

25.    Stoddard worked for McKinsey as a business analyst from August 2013 to April

2016.  McKinsey is a management consulting firm.  APT and McKinsey agreed to partner on

mutual customer relationships and in connection with APT's and McKinsey's client

development and client service activities, and agreed to share certain information, subject to

strict confidentiality, to pursue such mutual efforts as identified by personnel of both APT and

McKinsey.

26.     Pursuant to the Confidentiality Agreement between McKinsey and APT, McKinsey agreed to keep confidential and not to disclose APT's confidential information other than to its employees with a need to know such information and who were bound by nondisclosure obligations consistent with the terms of the Confidentiality Agreement.  Stoddard, as an employee of McKinsey, was subject to the Confidentiality Agreement and the obligations to which McKinsey agreed to preserve APT's confidential information.  Further, based on the terms of the Confidentiality Agreement, APT understands that Stoddard signed a non-disclosure agreement with McKinsey prohibiting the improper use and disclosure of APT's confidential information.  McKinsey confirmed in January 2017 that it had advised Stoddard of his continuing obligation to maintain the confidentiality of APT's confidential information and trade secrets pursuant to the Confidentiality Agreement.

27.     While working for McKinsey, Stoddard worked closely with APT for at least a five month period in 2015.  During this time period, Stoddard requested and obtained large amounts of APT's confidential and trade secret information pursuant to the Confidentiality Agreement.  This included PowerPoint presentations and case studies provided to Stoddard by APT, including an overview and technical details of APT's proprietary software, as well as identification of APT's clients.

28.     Unbeknownst to APT, despite Stoddard continuing to work at McKinsey, in February 2015, prior to the time that Stoddard obtained trade secrets from APT, Stoddard co-founded with Davis MarketDial, a Delaware corporation, intending to compete with APT in the predictive software business for retailers.   MarketDial registered as a foreign corporation in Utah on April 2, 2015.

29.     MarketDial specifically holds Davis and Stoddard out to be co-founders of MarketDial.  *See* https://beehivestartups.com/marketdial-allows-you-to-test-before-you-act-21cdc48acd74 (stating that co-founder Morgan Davis "and cofounder Johnny Stoddard, who also worked for years as a consultant, created an easy-to-use platform").  Stoddard's LinkedIn page (available at https://www.linkedin.com/in/johnny-stoddard-1382bb34) and Facebook page (available at https://www.facebook.com/johnny.stoddard) also list Stoddard as being the "Chief Data Scientist / Co-Founder" of MarketDial.

30.     On its website, MarketDial advertises that the MarketDial Accused System was "[b]uilt by ex-McKinsey and -BCG consultants."  *See* https://marketdial.com/features/

31.     Notably, Davis, the CEO of MarketDial, previously worked for the Boston Consulting Group ("BCG") as an Associate from 2012 - 2014.  BCG, a business consulting group, also had a prior relationship with APT which involved the use of APT's proprietary software for a mutual client, Einstein Noah Restaurant Group ("ENRG").  BCG and APT entered into a Third Party Access Agreement dated January 26, 2012 regarding BCG's use of APT's proprietary software ("Access Agreement") in the course of providing professional services to the ENRG.  Pursuant to the Access Agreement, BCG agreed to maintain the highest standards of confidentiality with regard to APT's software and to protect the software from unauthorized disclosure.  BCG also agreed to use the software only to support ENRG and that no BCG representative provided access to the software would be involved in developing a service which competes, directly or indirectly, with APT's software.

32.     Upon information and belief, Davis was a member of a BCG team that had access to APT's software.

33.     Shortly after MarketDial's founding in February 2015 and through July 2015, Stoddard interacted regularly with APT in the course of his duties at McKinsey.  However, Stoddard intentionally hid from APT that he was a co-founder of a competing company. Stoddard repeatedly requested and acquired confidential and trade secret APT information during this time, under the guise of benefiting the McKinsey and APT relationship.  As noted above, this APT trade secret information included PowerPoint presentations and case studies provided to Stoddard by APT, including an overview and technical details of APT's proprietary software, as well as identification of APT's clients, that could be used by MarketDial.

34.     For example, in February 2015, Stoddard requested and received from APT a PowerPoint presentation including details about APT's Test & Learn process, including its application to the financial services industry and an identification of the key elements of this process with corresponding illustrations.  This PowerPoint presentation also included several pictures of the user interface of the APT software.

35.     APT sent Stoddard a similarly detailed confidential PowerPoint presentation in June 2015 that included trade secret information about APT's Test & Learn software and process, the confidential user interface, and its applications to potential clients.

36.     Further, APT sent Stoddard a case study containing APT confidential information in April 2015, under explicit instructions that the case study was being sent under a non-disclosure agreement between APT and McKinsey and that Stoddard should keep the distribution limited.

37.     In June 2015, Stoddard further requested that APT send him another case study containing APT confidential information, acknowledging the obligations of McKinsey and its

employees under the Confidentiality Agreement and representing that confidential information would only be shared internally within McKinsey.

38.     Stoddard duped APT into providing him APT's confidential and trade secret information and concealed his plans to develop a competing software product through MarketDial.  In providing the requested information to Stoddard, APT detrimentally relied on Stoddard's misrepresentation that he requested this information for the benefit of McKinsey's client development work, which would ultimately benefit APT.  Despite obtaining APT's trade secrets in connection with client development work intended to benefit APT and McKinsey, Stoddard never provided APT any evidence that he actually used such information for work for McKinsey and APT, rather than simply acquiring APT's trade secrets for his own benefit.

### APT's Reasonable Measures to Maintain Its Proprietary Information

39.     At all times, APT has taken reasonable and appropriate measures to maintain the confidentiality of and to protect its proprietary information.

40.     APT requires its employees to enter into non-disclosure and confidentiality agreements to protect its confidential information and trade secrets.

41.     As part of its policies, APT requires that employees properly label information to ensure the confidentiality of its proprietary information.

42.     APT keeps its proprietary information on secure servers, protected by access controls, and requires encryption for proprietary information on employees' computers.  Certain key employees are also required to have an additional layer of security on their laptops to ensure protection of APT's proprietary information and trade secrets.

43.     APT has restricted access to visitors and third parties at its offices and facilities.

44.     APT requires that hard copies of proprietary information be stored in locked cabinets or safes and that those hard copies are shredded when no longer needed.

45.     APT does not permit its employees to use storage devices that are not APT-approved storage devices.

46.     APT also provides training to its employees on the proper handling of APT proprietary and trade secret information.

47.     APT also enters into non-disclosure agreements with clients, partners, vendors, suppliers, and consultants to the extent that APT shares its confidential information or trade secrets with third parties.

48.     Specifically, APT entered into the Confidentiality Agreement with McKinsey. APT also marked documents that it provided to McKinsey employees with the designation: "APT Confidential Information - Distribution by receiving party is prohibited," or similar designation.

49.     APT's Confidentiality Agreement with McKinsey also required that McKinsey's employees be subject to confidentiality obligations to maintain McKinsey information confidential, including all APT confidential information provided to McKinsey personnel.

**Defendants' Improper and Deceitful Conduct**

50.     Prior to and after MarketDial's founding in February 2015, Stoddard had access to and did access APT's confidential information and trade secrets in the course of his employment at McKinsey as part of a joint project with APT.  Stoddard deceived APT into believing Stoddard needed access to APT's confidential information for legitimate business purposes for APT's benefit and that APT's information would be protected by the APT and McKinsey Confidentiality Agreement.

51.     Stoddard acquired substantial knowledge of APT's confidential information and trade secrets through his deceitful conduct.  On information and belief, Stoddard co-founded

MarketDial in February 2015 to compete with APT.  MarketDial currently offers similar products and services to those offered by APT, including MarketDial's Accused System.

52.     Since MarketDial's founding in February 2015 and prior to Stoddard's departure from McKinsey in April 2016, he repeatedly requested and received confidential APT information, under the guise that it was for the benefit of McKinsey's work with APT.  This confidential APT information included PowerPoint presentations and case studies shared by APT with Stoddard, including an overview and technical details of APT's proprietary software, as well as identification of APT's clients.

53.     As co-founder and chief data scientist of MarketDial, it is inevitable that Stoddard intentionally and/or inherently disclosed APT's confidential information and trade secrets that he obtained while at McKinsey to MarketDial, for the benefit of MarketDial and Stoddard, and to the detriment of APT.

54.     Upon information and belief, MarketDial and Stoddard have incorporated APT's confidential information and trade secrets into MarketDial's products and services, including the Accused System.  For example, on information and belief, MarketDial's Accused System performs business initiative tests that are very similar to tests performed by APT's products and services and, based upon the appearance and functionality of MarketDial's Accused System, it could not have been developed within the time and with the modest investment of resources devoted by MarketDial to developing the Accused System, without the use of APT trade secrets. On information and belief, MarketDial has designed and modified its Accused System so as to be substantially similar—if not virtually identical, in certain aspects—to APT's products and services.  These modifications include functionalities relating to the creation of a business initiative test; the confidence value and the selection of the number of business locations in

which to test the business initiative; the selection and analysis of store attribute data; and the

analysis and display of the actual and predicted results of a business initiative test, all of which

appear to have been obtained from APT's trade secrets and which could not have been developed

within the time frame and/or resources devoted by MarketDial unless it used APT's trade secrets.

55.     These actions constitute willful trade secret misappropriation in violation of state

and federal law, including the Defend Trade Secrets Act (18 U.S.C. § 1836, et seq.) and the

Delaware Uniform Trade Secrets Act (6 Del. C. §§ 2001, et seq.).

56.     As a result of Stoddard's and MarketDial's misappropriation of APT's trade

secrets, MarketDial has competed unfairly with APT, resulting in APT losing customers.  In

addition, upon information and belief, MarketDial has misrepresented that it solely developed the

Accused System, and denied that it ever had access to APT's trade secrets or used APT's

patented technology.

57.     From the outset of first offering the Accused System in the marketplace,

MarketDial has expressly sought to directly compete with APT, contacting its customers and

comparing the MarketDial Accused System to APT's systems.

58.     If MarketDial's and Stoddard's willful misappropriation were not enough,

MarketDial has engaged in a smear campaign to damage APT in the marketplace through false

statements to APT's customers and potential customers, including that APT is "past its prime"

and falsely asserting that APT's customers are frustrated with the cost and complexity of the

APT solution.  MarketDial's marketing materials also mischaracterize APT's solution in

asserting that MarketDial's product is purportedly better than APT's.

59.     MarketDial's and Stoddard's actions have caused and will cause significant

financial harm to APT, including loss of customers.  MarketDial's and Stoddard's actions also

will cause APT to lose the benefit of its trade secrets and the legitimate competitive advantage that APT has earned though its substantial investments in such trade secrets.  MarketDial's and Stoddard's actions also jeopardize APT's relationships with its customers, prospective customers, suppliers, partners, employees, shareholders and investors, and other third parties and violate APT's intellectual property rights.

### The Patent-in-Suit

60.     Plaintiff APT is the owner by assignment of all right, title, and interest in and to United States Patent No. 8,571,916 ("the '916 Patent") entitled "Methods, Systems, and Articles of Manufacture for Determining Optimal Parameter Settings for Business Initiative Testing Models," which was duly and legally issued on October 29, 2013.  A copy of the '916 Patent is attached to the Complaint as Exhibit A.

61.     The '916 Patent is valid and enforceable under United States Patent Laws.

62.     The '916 Patent claims a technological solution to the critical problem of determining the optimal system parameters for a business initiative test, including by performing virtual tests on a set of virtual test sites using a parameter setting set of selected parameter setting options and determining the inconsistency between the performance data associated with the virtual test sites and the performance data associated with a set of control group sites.  By modifying the selected parameter settings and performing a virtual test, the optimal system parameters can be more quickly and efficiently ascertained by determining which selected parameter settings best minimize the inconsistency between the performance data associated with the virtual test sites and the performance data associated with a set of control group sites.

63.     The '916 Patent has been cited in United States patents and published patent applications multiple times as prior art before the United States Patent and Trademark Office, including patents and patent applications assigned to Google, Inc. and SugarCRM Inc.

### MarketDial's Use of APT's Patented Technology

64.    MarketDial has made, used, offered to sell, and/or sold and continues to make, use, sell, and/or offer to sell the Accused System within the United States.

65.    MarketDial has infringed the '916 Patent through the manufacture, use, sale and/or offer for sale of the Accused System.

66.    MarketDial's Accused System is described, *inter alia*, on the MarketDial website, available at marketdial.com.







67.     The functionality incorporated into MarketDial's Accused System is not yet fully available to APT as APT does not have access to MarketDial's source code.  APT believes that MarketDial infringes at least Claim 1 of its '916 Patent based on its investigation of the minimal publicly-available literature that MarketDial makes available, as well as an analysis of the

problem that MarketDial's Accused System purports to solve, as set forth in Count III below. APT expects to have further support for its infringement allegations upon inspection of the source code of MarketDial's Accused System and after a reasonable opportunity for further investigation and discovery.

68.     On December 18, 2017, APT sent a letter to MarketDial asking that it review APT's '916 Patent and requesting that the parties engage in a meaningful discussion concerning MarketDial's methodology used in the Accused System and the scope of APT's '916 Patent. MarketDial refused APT's request.

## COUNT I

### Misappropriation of Trade Secrets Under Defend Trade Secrets Act
### Against Defendants MarketDial and Stoddard
### (18 U.S.C. § 1836, et seq.)

69.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

70.     APT owns and possesses confidential and trade secret information, as alleged above.

71.     APT's confidential and trade secret information relates to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign commerce.  Specifically, APT's confidential and trade secret information concerning its predictive analytics software, including Test & Learn, Market Basket Analyzer, and Space Planning Optimizer, is used by customers throughout the United States.

72.     APT has taken reasonable measures to keep such information secret and confidential by, among other steps, limiting access to such information, requiring employees to attend training on the protection of APT's confidential and trade secret information, and

requiring employees to abide by confidentiality agreements and observe APT's policy on
protecting APT's proprietary and confidential information.

73.     APT's proprietary and confidential information derives independent economic
value from not being generally known to and not being readily ascertainable through proper
means by another person who could obtain economic value from the disclosure or use of the
information.

74.     In violation of APT's rights, Defendants Stoddard and MarketDial have willfully
misappropriated APT's trade secrets.  Stoddard deliberately deceived APT into providing its
trade secret information to Stoddard under the guise that the information was for the benefit of
the McKinsey and APT relationship, and instead formed MarketDial to use APT's trade secret
information for his own benefit.  This trade secret information includes PowerPoint presentations
and case studies shared by APT with Stoddard, including an overview and technical details of
APT's proprietary software, and its confidential business strategies unique to certain clients.  For
example, in February 2015, Stoddard requested and received from APT a PowerPoint
presentation including details about APT's Test & Learn process, including its application to the
financial services industry and an identification of the key elements of this process with
corresponding illustrations.  This PowerPoint presentation also included several pictures of
APT's confidential user interface of its software.  APT's software products, including its user
interface, are not available to the public, but are provided to customers who are subject to
confidentiality obligations.  In June 2015, Stoddard also obtained from APT a similarly detailed
PowerPoint presentation that included trade secret information about APT's Test & Learn
software and process, the confidential user interface, and its applications to potential clients.

75.     Upon information and belief, Stoddard solicited and collected APT's trade secret information, and used MarketDial as part of a scheme to misappropriate such trade secrets to get MarketDial up and running to develop software products to compete with APT and steal its business.  Further, upon information and belief, Stoddard and MarketDial have used and continue to use APT's trade secret information, knowing that it was misappropriated and obtained through deceitful means.  At a minimum, Stoddard and MarketDial could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products. Such misappropriation permitted MarketDial and Stoddard to develop their competing products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such trade secrets.

76.     Stoddard, on information and belief, is still in possession of APT's trade secret information, and is able to access and use this information.  Further, on information and belief, given Stoddard's position as the Chief Data Scientist and co-founder of MarketDial, it is inevitable that Stoddard has shared and will continue to share APT's trade secret information with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use, or are using this information to APT's detriment.  MarketDial admits on its own website that the MarketDial Accused System was "[b]uilt by ex-McKinsey and -BCG consultants."  By virtue of Stoddard's position as the Chief Data Scientist and his intimate knowledge of APT's software functionality and business strategies to which Stoddard was repeatedly exposed through his employment with McKinsey, Stoddard intentionally and/or inevitably relied on and used his knowledge of APT's software solution and trade secrets in his development of MarketDial's software.

77.     Stoddard's and MarketDial's misappropriation of APT's trade secret information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

78.     If Stoddard's and MarketDial's conduct is not remedied, they will continue to misappropriate, disclose, and use for their own benefit and to APT's detriment APT's trade secret information.

79.     Because APT's remedy at law is inadequate, APT seeks, in addition to damages, permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests.

80.     As the direct and proximate result of Stoddard's and MarketDial's conduct, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

81.     APT has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

## COUNT II

### Misappropriation of Trade Secrets Under Delaware Uniform Trade Secrets Act Against Defendants MarketDial and Stoddard (6 Del. C. §§ 2001, *et seq.*)

82.     APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

83.     APT owns and possesses confidential and trade secret information, as alleged above.

84.     APT has taken reasonable measures to keep such information secret and confidential by, among other steps, limiting access to such information, requiring employees to attend training on the protection of APT's confidential and trade secret information, and

requiring employees to abide by confidentiality agreements and observe APT's policy on

protecting APT's proprietary and confidential information.

85.     APT's proprietary and confidential information derives independent economic

value from not being generally known to, and not being readily ascertainable through proper

means by another person who could obtain economic value from the disclosure or use of the

information.

86.     In violation of APT's rights, Defendants Stoddard and MarketDial willfully

misappropriated APT's trade secrets.  Stoddard deliberately deceived APT into providing its

trade secret information to Stoddard under the guise that the information was for the benefit of

the McKinsey and APT relationship.  This trade secret information includes PowerPoint

presentations and case studies shared by APT with Stoddard, including an overview and

technical details of APT's proprietary software, and its confidential business strategies unique to

certain clients.  For example, in February 2015, Stoddard requested and acquired from APT a

PowerPoint presentation including details about APT's Test & Learn process, including its

application to the financial services industry and an identification of the key elements of this

process with corresponding illustrations.  This PowerPoint presentation also included several

pictures of APT's confidential user interface.  In June 2015, Stoddard also obtained from APT a

similarly detailed PowerPoint presentation that included trade secret information about APT's

Test & Learn software and process, the confidential user interface, and its applications to

potential clients.

87.     Upon information and belief, Stoddard solicited and collected APT's trade secret

information and used MarketDial as part of a scheme to misappropriate such trade secrets to get

MarketDial up and running to develop software products to compete with APT and steal its

business. Further, upon information and belief, Stoddard and MarketDial have in fact used APT's information, knowing that it was misappropriated and obtained through deceitful means. At a minimum, Stoddard and MarketDial could not have reasonably compartmentalized trade secret information learned from APT and thus inevitably would have used such information in developing their own competing products. Such misappropriation permitted MarketDial and Stoddard to develop their competing products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such trade secrets.

88.     Stoddard, on information and belief, still is in possession of APT's trade secret information, and is able to access and use this information. Further, on information and belief, given Stoddard's position as the Chief Data Scientist and co-founder of MarketDial, it is inevitable that Stoddard has shared and will continue to share APT's trade secret information with MarketDial, a direct competitor of APT, or fellow MarketDial employees, who may use, or are using this information to APT's detriment. By virtue of Stoddard's position as the Chief Data Scientist and his intimate knowledge of APT's software functionality and business strategies that Stoddard was repeatedly exposed to through his employment with McKinsey, Stoddard intentionally and/or inevitably relied on and used his knowledge of APT's software solution and trade secrets in his development of MarketDial's software.

89.     Stoddard's and MarketDial's misappropriation of APT's trade secret information has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

90.     If Stoddard's and MarketDial's conduct is not remedied, they will continue to misappropriate, disclose, and use for their own benefit and to APT's detriment APT's trade secret information.

91.     Because APT's remedy at law is inadequate, APT seeks, in addition to damages, permanent injunctive relief to recover and protect its trade secrets and other legitimate business interests.

92.     As the direct and proximate result of Stoddard's and MarketDial's conduct, APT has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

93.     APT has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

## COUNT III

### Patent Infringement of U.S. Patent No. 8,571,916 Against Defendant MarketDial

94.      APT repeats, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

95.     MarketDial directly infringes at least claim 1 of the '916 Patent.

96.     The Accused System, as made, used, sold, and/or offered for sale, performs a method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network.

97.     The Accused System, as made, used, sold, and/or offered for sale, performs each of the limitations of claim 1 of the '916 Patent.

98.     Claim 1 of the '916 patent recites:

> 1. A method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network, comprising:
>> identifying, by a computer, a business initiative testing model having a set of parameter settings;
>> selecting a first parameter setting set for performing a virtual test, the first parameter setting set including a set of selected parameter setting

options each respectively corresponding to one of the parameter settings for the business initiative testing model;

performing, by a computer, the virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is performed on the virtual test sites using a variation of each parameter setting;

determining, by a computer, actual performance data associated with the set of virtual test sites;

determining, by a computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

determining a noise value for the first parameter setting set, the noise value reflecting an inconsistency between performance data associated, with the set of virtual test sites and performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings;

determining, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results; and

configuring, by a computer, the business initiative testing model using the optimal parameter settings to test a business initiative for application in the business network.

99.     On information and belief, the Accused System practices all of the elements of Claim 1 of the '916 patent. The Accused System practices a method for determining optimal parameter settings for business initiative testing software used for testing initiatives for business locations included in a business network.  The Accused System identifies, by a computer, a business initiative testing model having a set of parameter settings.  On information and belief, these parameter settings include, but are not limited to, parameters affecting the Accused System's use of outlier performance data obtained during a business initiative test and parameters affecting the amount of historical performance data analyzed by the Accused System.

The business initiative testing model is described, *inter alia*, on the MarketDial website, available at marketdial.com.  *See, e.g.,*







100.    On information and belief, the Accused System selects a first parameter setting set for performing a virtual test, the first parameter setting set including a set of selected parameter setting options each respectively corresponding to one of the parameter settings for the business initiative testing model.  On information and belief, these parameter setting options include, but are not limited to, the setting options relating to parameters affecting the Accused System's use of outlier performance data obtained during a business initiative test and parameters affecting the amount of historical performance data analyzed by the Accused System. On information and belief, the parameter setting affecting the Accused System's use of outlier performance data obtained during a business initiative test includes a set of parameter setting options including, but not limited to, parameter setting options to (a) consider the outlier performance data as-is; (b) disregard the outlier performance data; and (c) weigh the outlier

performance data.  On information and belief, the parameter setting affecting the amount of

historical performance data analyzed by the Accused System includes a set of parameter setting

options including, but not limited to, parameter setting options for the Accused System to (a) use

four years-worth of historical performance data; (b) use two years-worth of historical

performance data; and (c) use less than two years-worth of historical performance data.

101.    On information and belief, the first parameter setting set is selected to perform a

virtual test.  First, if the Accused System includes a set of parameter setting options for both

parameters affecting the Accused System's use of outlier performance data obtained during a

business initiative test and parameters affecting the amount of historical performance data

analyzed by the Accused System, the Accused System selects one of the respective options for

each parameter.  On information and belief, both the parameter setting affecting the Accused

System's use of outlier performance data obtained during a business initiative test and the

parameter setting affecting the amount of historical performance data analyzed by the Accused

System can be set by the Accused System to any one of the respective parameter setting options

within the respective set of parameter setting options.

102.    Second, by selecting one of the respective options for each parameter, on

information and belief the Accused System selects the optimal parameter setting options by

performing a virtual test on at least some parameter setting options and determining which

selected parameter setting options best optimizes the business initiative test.  On information and

belief, the Accused System selects the parameter setting options within a respective set of

parameter setting options for either or each of the parameter setting affecting the Accused

System's use of outlier performance data obtained during a business initiative test and the

parameter setting affecting the amount of historical performance data analyzed by the Accused

System so as to optimize a given business initiative test. The Accused System does this, on information and belief, by performing a virtual test on at least some parameter setting options and determining which selected parameter setting options best optimizes the business initiative test. The precise manner in which the Accused System selects the parameter setting options within a respective set of parameter setting options will be shown by discovery, source code review, and examination and evaluation of the Accused System.

103. On information and belief, the Accused System performs, by a computer, the virtual test on a set of virtual test sites, each virtual test site reflecting a selected business location in the business network, wherein each virtual test is a simulated business initiative test performed on test sites where no actual initiative test has been implemented at those test sites, and wherein the virtual test is performed on the virtual test sites using a variation of each parameter setting. On information and belief, each such virtual test performed by the Accused System is performed using the actual performance data of test sites in the period prior to the implementation of the initiative test. Thus, on information and belief, the simulated business initiative test is performed on test sites where no actual initiative test has yet been implemented. On information and belief, each such virtual test is performed on the virtual test sites using one of the parameter setting options within the respective set of parameter setting options for each or either of the parameter setting affecting the Accused System's use of outlier performance data obtained during a business initiative test and the parameter setting affecting the amount of historical performance data analyzed by the Accused System. The virtual test is thereby performed on the virtual test sites using a variation of each parameter setting. These variations of parameter settings include, but are not limited to, the setting options relating to parameters affecting the Accused System's

use of outlier performance data obtained during a business initiative test and parameters affecting the amount of historical performance data analyzed by the Accused System.

104.   On information and belief, the Accused System determines, by a computer, actual performance data associated with the set of virtual test sites.  On information and belief, the Accused System obtains at least two years-worth of historical sales data for the virtual test sites from the pre-period, prior to any implementation of the business initiative.  The Accused System uses actual data provided by its customers. *See, e.g.*, https://marketdial.com/features.  On information and belief, the data uploaded by the customer is associated with a set of virtual test sites.



105.   On information and belief, the Accused System determines, by a computer, actual performance data associated with a set of control group sites reflecting second selected business locations in the business network using the tested parameter settings.  On information and belief, the Accused System obtains at least two years-worth of historical sales data for the control group sites from the pre-period, prior to any implementation of the business initiative.  The Accused System uses actual data provided by its customers.  *See, e.g.*, https://marketdial.com/features.

On information and belief, the data uploaded by the customer is associated with a set of control group sites.

106.    On information and belief, the Accused System determines a noise value for the first parameter setting set, the noise value reflecting an inconsistency between performance data associated with the set of virtual test sites and performance data associated with the set of control group sites reflecting second selected business locations in the business network using the tested parameter settings.  On information and belief, the Accused System uses a virtual test to determine the optimal system parameters, comparing the performance data associated with the set of virtual test sites with the performance data associated with the set of control group sites, thereby determining a noise value associated with each parameter setting set.  The precise manner in which the Accused System determines a noise value will be shown by discovery, source code review, and examination of the Accused System.

107.    On information and belief, the Accused System determines, by a computer, a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results.  On information and belief, the Accused System chooses the parameter setting options within a respective set of parameter setting options for either or each of the parameter setting affecting the Accused System's use of outlier performance data obtained during a business initiative test and the parameter setting affecting the amount of historical performance data analyzed by the Accused System so as to optimize a given business initiative test.  On information and belief, the Accused System optimizes the given business initiative test by choosing the respective parameter setting options such that the performance data associated with the set of virtual test sites and the performance data associated with the set of control group sites is best matched to each other,

whereby the optimal parameter settings best minimize noise from the results.  The precise manner in which the Accused System determines a set of optimal parameter settings for the business initiative testing model based on results from the virtual test whereby the optimal parameter settings best minimize noise from the results will be shown by discovery, source code review, and examination and evaluation of the Accused System.

108.    On information and belief, the Accused System configures, by a computer, the business initiative testing model using the optimal parameter settings to test a business initiative for application in the business network.  On information and belief, once the Accused System has determined the optimal parameter settings using the above method, these optimal parameter settings are used to configure the business initiative testing model.  *See, e.g.*, https://marketdial.com/features and https://marketdial.com.





109.    After adequate discovery, APT reserves the right to assert allegations of infringement of additional claims of the '916 Patent.

110.    MarketDial's direct infringement as described above has injured and continues to injure APT, and APT is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

111.    MarketDial has had notice of the '916 Patent since at least December 18, 2017.

112.    MarketDial's infringement of the '916 Patent has been and continues to be willful and deliberate as MarketDial has acted in an objectively reckless manner in view of the high likelihood that its acts constituted infringement of the '916 Patent and with full knowledge of APT's rights in the '916 Patent.  As discussed above, MarketDial has known of the '916 Patent

and its infringement of the '916 Patent has continued nevertheless.  APT is entitled to increased

damages pursuant to 35 U.S.C. § 284 and attorneys' fees and costs pursuant to 35 U.S.C. §285.

## JURY DEMAND

Plaintiff APT respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues

so triable.

WHEREFORE, Plaintiff APT respectfully demands judgment in its favor and against

MarketDial and Stoddard as follows:

a.  Declaring that MarketDial and Stoddard have misappropriated APT's confidential

and trade secret information pursuant to the Defend Trade Secrets Act and Delaware

Uniform Trade Secrets Act, and that the misappropriation has been willful.

b.  Declaring that MarketDial has infringed the '916 Patent, and that the infringement

has been willful.

c.  Awarding damages as described in each of the above claims, in favor of plaintiff APT

and against MarketDial and Stoddard in amounts to be determined at trial.

d.  Enjoining MarketDial and Stoddard and their respective officers, agents, servants,

employees and attorneys, and all other persons in active concert or participation with

them,  from using APT's trade secret information and from selling, offering for sale,

marketing or using the Accused System.

e.  Enjoining MarketDial and its respective officers, agents, servants, employees,

attorneys, and those persons in active concert or participation with MarketDial who

receive actual notice of the order by personal service or otherwise, from selling,

offering for sale, marketing, or using the Accused System MarketDial's Accused

System and any other infringement of the '916 Patent.

f.   Awarding exemplary damages in favor of APT and against MarketDial and Stoddard in an amount to be determined at trial.

g.   Granting judgment that MarketDial has willfully infringed one or more claims of the '916 Patent.

h.   Awarding enhanced damages to compensate APT for MarketDial's willful infringement, including damages pursuant to 35 U.S.C. § 284.

i.   Awarding APT pre-judgment and post-judgment interest, and its attorneys' fees, costs and other expenses incurred in this action.

j.   Granting APT such other and further relief as this Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

_____

Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@mnat.com
mflynn@mnat.com

*Attorneys for Plaintiff Applied Predictive Technologies, Inc.*

OF COUNSEL:

Kirk R. Ruthenberg
Eric Sophir
Eric Y. Wu
DENTONS US LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 496-7500

Jennifer Bennett
DENTONS US LLP
One Market Plaza
Spear Tower, 24th Floor
San Francisco, CA  94105

Patrick Doll
DENTONS US LLP
2000 McKinney Avenue, Suite 1900
Dallas, TX  75201-1858

June 28, 2018